IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
OF NEW YORK

| | |
|---|---|
| **SILVER LEAF PARTNERS, LLC** | |
|                       **PLAINTIFF** | |
|   **v.** | |
| **TIPTREE INC.** | |
| and | |
| **NEIL RIFKIND, INDIVIDUALLY and IN HIS CAPACITY AS VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY OF TIPTREE INC.** | **Case No. 1:20-cv-04687** |
| and | |
| **SANDRA BELL, INDIVIDUALLY and IN HER CAPACITY AS CHIEF FINANCIAL OFFICER OF TIPTREE INC.** | |
| and | **AMENDED COMPLAINT** |
| **RANDY MAULTSBY, INDIVIDUALLY and IN HIS CAPACITY AS DIRECTOR—TIPTREE CORPORATE STRATEGY & DEVELOPMENT OF TIPTREE INC.** | |
| and | |
| **JONATHAN ILANY, INDIVIDUALLY and IN HIS CAPACITY AS CHIEF EXECUTIVE OFFICER OF TIPTREE INC.** | |
| and | |
| **MICHAEL BARNES, INDIVIDUALLY and IN HIS CAPACITY AS EXECUTIVE CHAIRMAN AND CHAIRMAN OF THE BOARD OF DIRECTORS OF TIPTREE INC.** | |
| and | |
| **STEFANOS KASSELAKIS, INDIVIDUALLY and IN HIS CAPACITY AS CHIEF EXECUTIVE OFFICE OF SWIFTBULK INC. AND TIPTREE MARINE LLC** | |
|                       **DEFENDANTS** | |

## COMPLAINT

**COMES NOW** Silver Leaf Partners, LLC, who files this Complaint and alleges as

follows:

## PARTIES and RELEVANT NON-PARTIES

2

1.      Plaintiff, Silver Leaf Partners, LLC, ("Silver Leaf"), is a New York limited liability company with its principal office located at 200 Park Avenue, 17th Floor, New York, New York 10166-0004.

2.      Kathleen Lauster, at all relevant times herein, was an individual agent and registered representative of Silver Leaf, and engaged in furtherance of Silver Leaf's rights and obligations under a certain Engagement Letter dated September 26, 2016 (hereinafter referred to as "Agreement" or "Engagement Letter"), between Silver Leaf and the consolidated subsidiaries and affiliated companies of Defendant Tiptree Inc. ("Tiptree").

3.      Tiptree is a Maryland Corporation organized, existing and doing business under and by virtue of the laws of the State of Maryland, with its principal executive office and principal place of business located at 299 Park Avenue, 13th Floor, New York, New York 10171 and acted in concert with all other Defendants.

4.      Defendant Neil Rifkind is an individual and at all relevant times herein was Vice President, General Counsel and Secretary of Tiptree and acted in concert with all other Defendants.

5.      Defendant Sandra Bell is an individual and at all relevant times herein was Chief Financial Officer of Tiptree and acted in concert with all other Defendants.

6.      Defendant Randy Maultsby is an individual and at all relevant times herein was Director of Corporate Strategy and Development for Tiptree and acted in concert with all other Defendants.

7.      Defendant Jonathan Ilany is an individual and at all relevant times herein was Chief Executive Officer of Tiptree and acted in concert with all other Defendants.

8.      Michael Barnes is an individual and at all relevant times herein was the Executive Chairman and Chairman of the Board of Directors of Tiptree and acted in concert with all other Defendants.

9.      Defendant Stefanos Kasselakis is an individual who acted in concert with all other Defendants and at all relevant times herein was ~~Chief Executive Officer~~Vice President of Phila Coatings Chemicals USA, Inc. ("Phila Coatings"), and/or Chief Executive Office of SwiftBulk Inc. ("SwiftBulk") and/or Chief Executive Officer of Tiptree Marine LLC ("Tiptree Marine"), all of which are, now or were at all relevant times herein affiliates and/or consolidated and/or controlled entities of Tiptree.

## JURISDICTION AND VENUE

10.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 over the state law claims because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     Venue is proper in this Court under 15 U.S.C. § 22, because each of the aforementioned Defendants are found or transact business in this District.

12.     Venue is also proper under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to these claims occurred in this District.

## FACTUAL BACKGROUND

### Summary

13.     On July 21, 2016, Stefanos Kasselakis approached Kathleen Lauster with an idea to form a new entity for the purpose of acquiring shipping vessels and related maritime entities.~~.~~

14.     His initial plan was to raise a good portion of the capital via a SEC Regulation D (Reg. D) funding vehicle or some such other private offering process.

15.     To be eligible for such a raise, however, it would be necessary to first source a minimum amount of seed capital and to have in place a business plan and a business process.

16.     Stefanos sought Kathleen's guidance in fleshing out a plan for the business, determine the capital structure, source seed capital, and generally assist with all aspects of a capital raise and other activities associated with a startup enterprise.

17.     As then known to Stefanos, Kathleen was an experienced Wall Street investment banker and business consultant with a track record in alternative asset capital raises, startup ventures and possessing broad experience and skillsets in a variety of industries.

18.     Stefanos assured Kathleen that her participation in this startup venture would be well worth her time because he expressed to her his understanding that her skillsets, contacts and general participation would be critical to his and, ultimately, the venture's success.

19.     On July 29, 2016, Stefanos shared with Kathleen the work he had undertaken to date, which included a barebones organizational structure, generalized role descriptions, and a basic start-up budget.

20.     Stefanos acknowledged the need to create a substantially more dynamic financial model, including scenario models, rate sensitivity, annualized summary, and valuation analysis expected by the sort of sophisticated parties that he hoped to pitch the venture (Exhibit 1).

21.     At this early stage, Kathleen's role was not yet fully fleshed out, but presumed to include some amount of founder's equity for her efforts and her likely participation in the future capital raising activities.

22.     Because this was an idea for a business and not an actual business, Kathleen requested a modest fee of $5,000 (of which she only received $2,000) plus future equity for her to help kick-off the effort and see if the concept had viability before she sought a formal engagement with and through her broker dealer, Silver Leaf.

23.     On September 26, 2016, at the request of Kathleen, Silver Leaf entered into an Agreement or Engagement Letter (hereinafter referred to as the "Agreement" or "Engagement Letter") with the first company established in furtherance of this venture by Stefanos, Phila Coatings (Exhibit 2).

24.     The first numbered paragraph of the Agreement reads as follows (***emphasis added*** where noted):

1. This letter will confirm our understanding and sets forth the terms pursuant to which Silver Leaf Partners, LLC. ("SLP") shall be engaged ***by Phila Coatings Chemicals, USA, Inc. and its affiliated entities*** (collectively, the "Company") ***to assist in the structuring, negotiating, and effecting of an appropriate Transaction*** (as herein defined) for the benefit of the Company, ***and if requested, the development and evaluation of strategies to maximize the Company's value***. Such transactions, with SLP may include, without limitations, one or more of the following alternatives (each referred to herein as "Transaction"):

(a) Any capital raising activities for the Company for any purpose ***including, but not limited to, the establishment of a new entity(s) (each, a "New Entity") or capital or asset acquisition(s) (e.g., shipping vessels)***;

(b) ***An appropriate financing of any kind for the Company that is accepted by the Company***;

(c) ***The formation of an affiliated entity, partnership or other business relationship or agreement between the Company and another party;*** or

(d) ***Any such other capital as may be mutually agreeable by the Company and an investor, financer or lender***.

It is expressly understood and acknowledged that any Transaction will be on a "best efforts basis" made by SLP.

6

25.     Each "New Entity" established for the purpose of this venture, and as contemplated by paragraph 1(a) of the Agreement ultimately included SwiftBulk, Tiptree Marine, and Swift Bulk Holding Co. Ltd ("Swift Bulk Holding").

26.     Discovery may reveal the existence of other entities heretofore hidden from Plaintiff.

27.     The sixth numbered paragraph of the Agreement reads as follows (*emphasis added* where noted):

6. As compensation for our services hereunder, the Company will pay or award to SLP the following:

(a) ***Retainer Fee***: A non-refundable cash retainer fee of Five Thousand ($5,000.00) U.S. Dollars (the "Retainer Fee") payable upon execution of this agreement.

(b) ***Incentive Fee***: An incentive fee (the "Incentive Fee") based upon the value of the Consideration (as hereinafter defined) involved in any Transaction described in Paragraph 1 with an Introduced Party (defined below), shall be payable in cash upon the consummation of such Transaction. Such Incentive Fee shall be calculated in the following manner: ***five percent (5%) up to five million dollars ($5,000,000) and seven percent (7%) of the aggregate consideration in excess of five million dollars ($5,000,000).***

(c) Should the Company complete any of the following capital related instruments (each a "Transaction") with an Introduced Party (defined below), the Company shall pay SLP a cash fee at closing based upon the total face value of the transaction in accordance with the following schedule: an amount equal to one percent (1%) of any and all consideration received by the Company in any debt financing not convertible into equity ("Senior Financing").

27.     The eleventh numbered paragraph of the Agreement reads as follows (***emphasis added*** where noted):

11. ***SLP's engagement hereunder may be terminated at any time one hundred and eighty (180) days after the date of this agreement***, *with or without cause by either SLP or the Company upon written notice thereof to the other party*, provided, however, that ***in the event of any termination, SLP will be entitled to its full Incentive Fee provided for herein in the event that at any time prior to the expiration of twenty four (24) months after such termination (the "Tail Period") the Company completes a Transaction involving*** (x) a party identified orally, or in writing to the Company by SLP during the Term of SLP's engagement hereunder, ***(y) a party that contacts the Company***

*during the Term, or (z) a party that the Company contacts during the Term of SLP's engagement hereunder whether or not such discussions were initiated by SLP.*

28.    As of April 4, 2018, Phila Coatings, SwiftBulk, Tiptree Marine, and Swift Bulk Holding were all one and the same entity and/or affiliated companies and/or operated as such and/or were all owned and/or controlled by Tiptree.

29.    On April 4, 2018, Neil Rifkind, Vice President, General Counsel and Secretary of Tiptree by email at 9:45am EST informed Silver Leaf that Tiptree's affiliated companies Phila Coatings, and SwiftBulk and their affiliated companies Tiptree Marine and SwiftBulk Holding and their respective controlled affiliates refuse to honor the terms of the Engagement Letter (Exhibit 3).

30.    By its own admission on June 8, 2020, in Exhibit 123, Tiptree was not a party to the Engagement Letter (Exhibit 2).

29.31.  As a non-party to the Engagement Letter (Exhibit 2) Tiptree and its General Counsel, Neil Rifkind, had no legal or other right to terminate the obligations and duties of actual parties (Exhibit 3) to the Engagement Letter.

30.32.  Defendants termination of the Engagement Letter triggered the twenty-four (24) month "Tail Period" clause of the eleventh numbered paragraph thereofof the Engagement Letter (Exhibit 2).

31.33.  As a result of Rifkind's and Tiptree's termination of the Engagement Letter on April 4, 2018, Silver Leaf is entitled, pursuant to paragraphs 11(y) and 11(z) thereof, to its full Incentive Fee on investments made by Tiptree into Phila Coatings, SwiftBulk, Swift Bulk Holding, Tiptree Marine and any other heretofore unknown but affiliated company of Phila Coatings, as contemplated and covered by the terms of the Engagement Letter.

8

32.34.  The Engagement Letter formula for the Incentive Fee payable to Silver Leaf, as triggered by paragraphs 11(y) and 11(z), is set forth in paragraph 6(b) as being five percent (5%) up to five million dollars ($5,000,000) and seven percent (7%) of the aggregate consideration in excess of five million dollars ($5,000,000).

33.35.  Tiptree is a Maryland Corporation that was incorporated on March 19, 2007.

34.36.  Tiptree's Common Stock trades on the Nasdaq Capital Market under the symbol "TIPT". Tiptree is a holding company that combines specialty insurance operations with investment management services.

35.37.  On the one hand, Tiptree allocates capital across insurance operations and other investments which it classifies under one consolidated subsidiary called Tiptree Insurance.

36.38.  On the other hand, Tiptree refers to its non-insurance operations, assets and other investments, inclusive of its non-reportable segments and other business activities, under another consolidated subsidiary named Tiptree Capital.

37.39.  Tiptree reported publicly to the Securities and Exchange Commission in its public filings that, as of 12/31/2018, its wholly-owned subdivision Tiptree Capital invested capital of $48.7 million into "Maritime transportation" presumably including, but not limited to, Phila Coatings, SwiftBulk, Swift Bulk Holding, Tiptree Marine and any other heretofore unknown but affiliated company of Phila Coatings. (See page 11 of Exhibit 124)

38.40.  Pursuant to paragraphs 1, 11(y), 11(z) and 6(b) of the Engagement Letter, Silver Leaf's Incentive Fee for 2018 is $3,309.000.00.

39.41.  Neither Phila Coatings or any of its affiliated entities, as parties to the Engagement Letter and as contemplated by the Engagement Letter, have paid the $3,309.000.00

Incentive Fee because Tiptree has stopped them from doing so and, as a result of such action, Tiptree has tortiously interfered with said contractual relationship.

40.42.  Tiptree reported to the Securities and Exchange Commission in its public filingspublicly that as of 12/31/2019 its wholly-owned subdivision Tiptree Capital invested additional capital of $25.6 million into "Maritime transportation" presumably including, but not limited to, Phila Coatings, SwiftBulk, Swift Bulk Holding, Tiptree Marine and any other heretofore unknown but affiliated company of Phila Coatings.  (See page 11 of Exhibit 124)

41.43.  Pursuant to paragraphs 1, 11(y), 11(z) and 6(b) of the Engagement Letter, Silver Leaf's Incentive Fee for 2019 is $1,692.000.00.

42.44.  Neither Phila Coatings or any of its affiliated entities, as parties to the Engagement Letter and as contemplated by the Engagement Letter, have paid the $1,692.000.00 Incentive Fee because Tiptree has stopped them from doing so and, as a result of such action, Tiptree has tortiously interfered with said contractual relationship.

43.45.  Tiptree reported to the Securities and Exchange Commission in its public filings publicly that as of 3/31/2020 its wholly-owned subdivision Tiptree Capital invested additional capital of $500,000 into "Maritime transportation" presumably including, but not limited to, Phila Coatings, SwiftBulk, Swift Bulk Holding, Tiptree Marine and any other heretofore unknown but affiliated company of Phila Coatings.  (See page 10 of Exhibit 125)

44.46.  Pursuant to paragraphs 1, 11(y), 11(z) and 6(b) of the Engagement Letter, Silver Leaf's Incentive Fee for the first quarter of 2020 is $25,000.00.

45.47.  Neither Phila Coatings or any of its affiliated entities, as parties to the Engagement Letter and as contemplated by the Engagement Letter, have paid the $25,000.00

Incentive Fee because Tiptree has stopped them from doing so and, as a result of such action, Tiptree has tortiously interfered with said contractual relationship.

46.48.  Silver Leaf is owed an Incentive Fee on any additional capital invested by Tiptree Capital into "Maritime transportation" on April 1, April 2, and April 3 and April 4 of the year 2020 and, possibly, for additional times thereafter.

47.49.  The total amount of Incentive Fee owed to Silver Leaf *at least* according to public filings made by Tiptree through 3/31/2021 pursuant to paragraphs 1 and 11(y) and 11(z) and 6(b) of the Engagement Letter is $5,026,000.00 plus interest.

**Discussion and Details**

48.50.  Returning to the genesis discussions between Kathleen and Stefanos, Kathleen identified the following items which would be needed in order to support a formal engagement with Silver Leaf, including (Exhibit 4):

- Executive Summary
- Summary Slide presentation [Management Presentation]
- Financial Projections
- Comprehensive Business Strategy (documented plan to include industry analysis market forecasts, comps, etc.)
- Risk Factors

49.51.  After engaging, and for a period of 19 months, until business and then settlement negotiations terminated on March 23, 2018 at the direction of Tiptree, Kathleen and Silver Leaf remained at the Defendants disposal for all matters necessary to support the creation of SwiftBulk on November 9, 2016, as well as additional add-along transactions (including the inclusion of Phila Coatings and the initial evaluation of an Ecochlor acquisition).

11

50.52.  Activities on behalf of the Defendants varied from mundane tasks such as fixing fonts & managing data room, to providing office space for numerus meetings, as well as more sophisticated undertakings such as creating detailed multi-dynamic financial models, scenario analyses, capital introductions, preparing analyses for AM Nomikos business negotiations and even assistance with negotiations around the Tiptree Letter of Intent which was the hoped-for transaction of this Plaintiff and each of the Defendants.

51.53.  The content and commitment of this Plaintiff ran the full business cycle from conception to strategy to development to transaction consummation.

52.54.  Plaintiffs' efforts are best categorized into four service phases which are further outlined below: 1) Initial Launch / Startup; 2) Tiptree Negotiations & Minority Capital Fundraising; 3) Post-Fundraising Continued Transaction Support; and 4) Transaction Closing and Settlement Negotiations.

Initial Launch / Start-up (August 2016 – Mid January 2017)

53.55.  The Initial Launch / Start-up phase lasted roughly from early August 2016 until receipt of Tiptree's initial Letter of Intent ("LOI") on January 12, 2017 (6 months).This period represented a timeframe of intense activity, with daily emails, working sessions, meetings, and other activities designed to manifest the business and attract investor capital.B

54.56.  Because the target investor focus was companies and individuals who had not necessarily invested in the shipping sector before, a substantial amount of upfront "investor education" materials needed to be prepared to speak to a broader group of capital allocators.

55.57.  During this timeframe, Kathleen was almost exclusively devoted to working on the development of SwiftBulk as a fundable entity, and spent at least 80% of her time on these efforts.

12

~~56.~~59.  Reflecting the start-up nature of the transaction at that time, working meetings were held at all hours of the day and weekends and many of these collaborative sessions were conducted in Stefano's apartment or Kathleen's social club.

~~57.~~59.  For a period of time, Stefanos ~~required~~ suggested that Kathleen ~~to~~ join him for work sessions at his WeWork location.

~~58.~~60.  In addition, starting on December 3, 2016, 1.5 to 2-hour mandatory weekend team calls were instituted and Kathleen participated in all of these off-hours working sessions which continued for months through March 27, 2017.

~~59.~~61.  In addition to requiring various tangible deliverables of Kathleen, numerous meetings were scheduled during this time period by Kathleen, Stefanos, and others would conduct business with lawyers, commercial bankers, alternative debt providers, market consultants, and other relevant industry parties.

~~60.~~62.  At the constant insistence of Stefanos, Kathleen participated and acted as an advisor in most, if not all, of these meetings.

~~61.~~63.  In addition, Kathleen included Stefanos in industry networking events and represented Stefanos/SwiftBulk at industry conferences, both locally and out-of-town to bring interest and exposure to the Defendants.

~~62.~~64.  For the benefit of the Defendants, Kathleen advised the original offering, structuring and modeling of a fund-and-promote strategy based on similar offerings found in the market (Exhibit 5).

~~63.~~65.  Over time, the nature of the offering would change several times and, each time, Kathleen played a key role in devising the structure, quantifying the economics, and articulating the pros & cons of each strategy that would later substantially benefit the Defendants.

64.66.  On November 9, 2016, SwiftBulk was formed as a general corporation in Delaware in furtherance of the business model contemplated by the Plaintiff and the Defendants.

65.67.  On November 18, 2016, Kathleen hosted a conference call on SwiftBulk's behalf from Silver Leaf's offices featuring a Q&A format hosted by Kathleen with Stefanos & Panos Tsilingiris as the conference speakers.

66.68.  In addition to outside attendees, several Silver Leaf bankers and brokers participated which led to subsequent potential investor meetings that benefited the Defendants.

67.69.  Shortly thereafter, fundraising efforts by Silver Leaf began in earnest.

68.70.  Since Silver Leaf was the financial advisor of record, all potential introductions were to be tracked and coordinated with and through Kathleen.

69.71.  On December 15, 2016 Kathleen distributed a detailed SwiftBulk marketing plan (Exhibit 6) designed to educate the team on the marketing process and the intricacies of coordinating a fundraising effort.

70.72.  Included in this plan were detailed stages of fund development, analysis of various investor profiles, detailed steps for marketing to high net worth individuals and family offices, and outlining of the following steps involved in marketing to investors: prospect list development, prioritization, and conversion.

71.73.  Further, a template was created to list active contacts and potential investors to ensure that Silver Leaf had full visibility and control over the process (Exhibit 7).

72.74.  For the next month, various meetings were conducted with potential investors, both leads that originated from Silver Leaf as well as other referral sources and whether the leads came from Silver Leaf or from other parties, Kathleen participated in the meetings, coordinated the NDA's, strategized on the marketing efforts, and all matters related thereto.

14

73.75.  On Friday, January 9, 2017, Stefanos informed Kathleen that he expected to be receiving an LOI from Tiptree expressing their interest in a transaction with SwiftBulk.

74.76.  In anticipation of this letter, Stefanos requested examples of typical due diligence checklists and a description of the major components of an LOI, which Kathleen furnished (Exhibit 8).

75.77.  On Monday, January 11, 2017, Stefanos received and forwarded Tiptree's original LOI to Kathleen for review and analysis.

76.78.  Key deliverables and work product from Kathleen during this phase of work included the following:

- Market Teaser (draft template provided by Kathleen, substantial input in content and editing) (Exhibit 9);
- Initial Financial Model & Cap Table (including back-up market data and analysis tabs) (Exhibit 10);
- Analysis on Fund / Promote structure (Exhibit 11);
- Draft Offering Memorandum & Marketing Material (Exhibit 9, 12 & 13);
- Family Office Investor contact list (Exhibit 14);
- Facilitated a Dry Bulk Market Update Call (Exhibit 15);
- SwiftBulk Marketing plan (Exhibit 6); and
- Examples of typical due diligence checklists and major component of a letter of intent (Exhibit 8).

77.79.  As Stefanos knew, engaging Silver Leaf satisfied Financial Industry Regulatory Authority (FINRA) requirements for third-party fundraising efforts.

78.80.  As Stefanos knew and desired, adding the Silver Leaf logo to all SwiftBulk marketing materials made the investment opportunity more attractive.

79.81.  Further, gaining access to Silver Leaf's offices and the Silver Leaf broker network broadened the reach of the fundraising efforts for the benefit of the Defendants. In addition to offering larger facilities for the SwiftBulk working group to collaborate, Silver Leaf's offices, in

the landmark Graybar Building adjacent to Grand Central Terminal, provid~~ided~~ a valuable footprint to the ~~footprint of the~~ effort.

~~80.~~ 82.   In fact, Stefanos even co-opted Silver Leaf's business address and added it to his email signature in order to add a degree of legitimacy to investor meetings and outreach held for the benefit of the Defendants (Exhibit 15, 16, 17 and 22).

~~81.~~ 83.   Over time, additional advisors & team members were brought on board by Kathleen and Stefanos and each contributed varying degrees of effort, depending on their skills and availability, from web development, to market intel, to legal advice, and so on.

~~82.~~ 84.   Reflecting the efforts of this initial group that Stefanos labeled the "Founder's Team," an initial Founders Agreement proposal was drafted based on work completed as of November 30, 2016 (Exhibits 17, 18 and 19).

~~83.~~ 85.   The draft agreement contemplated Kathleen receiving a 9% ownership interest in SwiftBulk, which offer was more than any other member of the Founder's Team because, even at that point, it was recognized, and now acknowledged, that Kathleen's contribution to the effort was second only to Stefanos himself.

~~84.~~ 86.   Despite staging the offer, Stefanos, as is his business habit, would not follow through on giving credit where credit was due so, for reasons entirely unclear, the Founders Agreement was never executed (Exhibit 20).

~~85.~~ 87.   Ultimately, no one person devoted as much time and produced as many deliverables over the entire 19 months as Silver Leaf and Kathleen which was acknowledged by Stefanos when he reflected in an October 30, 2017 message that "[i]t's essentially that you and GG [George Graham] made this happen / So you two combined should be getting a 100% fair

deal / The rest of the team supported and can have a nice upside / But you two should be taken care of" (Exhibit 21).

~~86.~~88.  Due to the extraordinary amount of time and effort involved on various fronts, it is worth remarking on Kathleen's involvement in the selection of legal counsel.

~~87.~~89.  For a period from December 5, 2016 until March 16, 2017 when Mintz Levin was engaged for services, Kathleen participated alongside George Graham, Gary Christelis, and/or Stefanos in numerous meetings with various other law firms.

~~88.~~90.  All told, Kathleen met with at least ten different firms, and in many instances, she participated in multiple meetings with those firms in furtherance of SwiftBulk's business.

~~89.~~91.  These meetings were often detailed in content and lasting several hours apiece as the lawyers opined on an appropriate legal structure and approach for this complex transaction with Tiptree.

~~90.~~92.  In the end Stefanos (who was unable to attend all the meetings himself) relied heavily on Kathleen for the ultimate selection and engagement of legal counsel on the most important business event in the life of SwiftBulk.

~~91.~~93.  Based on Kathleen's advice, Stefanos ultimately engaged Mintz Levin, because it was a team Kathleen had worked with in the past and that she believed could be counted on to work with effectively to close the Tiptree transaction.

<u>Tiptree Negotiation & Minority Capital Fundraising (Mid-January 2017 – Mid-June 2017)</u>

~~92.~~94.  Upon receipt of Tiptree's initial LOI, the Silver Leaf engagement evolved into a new phase of work and throughout this timeframe Kathleen continued to devote about 80% of her time on SwiftBulk.

93.95.  Sandra Bell, CFO of Tiptree, was made aware of Kathleen's work early on by Stefanos who credited Kathleen for constructing the first financial model requested by Tiptree (Exhibit 123).

94.96.  The initial plan, as expressed by Stefanos, was to use Tiptree's LOI to secure other interest and he wished to "use their [Tiptree's] term-sheet as currency for other institutions." (Exhibit 22 and 23).

95.97.  Indeed, several potential meetings took place in the following weeks to explore alternative transaction partners.

96.98.  Simultaneously, Stefanos and Kathleen continued negotiating the LOI with Tiptree with an eye to keeping their options open to bringing in other investors so that Tiptree would not have too strong of a controlling hand in the negotiations and any ultimate transaction.

97.99.  During this time, Kathleen was first introduced to Tiptree personnel on January 24, 2017, when she joined George Graham and Stefanos in a meeting with Tiptree CEO Jonathan Ilany to discuss initial the team's feedback on Tiptree's LOI.

98.100.       As usual, a good deal of preparation by Kathleen went into that meeting, including a merits analysis of the term sheet and its key terms, and comparing that to the Tiptree investments and acquisitions as disclosed in their regulatory filings.

99.101.       In the following weeks, Kathleen played a critical role in the back-and-forth negotiations of terms and conditions associated with the Tiptree LOI.

100.102.       Since legal counsel was not engaged until March 16, 2017 (a mere week before the LOI was ultimately executed), these negotiations focused almost exclusively on business matters with Stefanos and the team relying heavily on Kathleen's experience and skillsets in transaction negotiations.

101.103.    In fact, Kathleen led the drafting of a response to the original LOI and built the negotiation case for founder's equity / economics that were contemplated as part of the deal (Exhibit 24).

102.104.    As a necessary part of reducing the LOI to an actual transaction, Kathleen delivered a detailed analysis of the original & subsequent versions of the LOI, potential capitalization analysis, control analysis (Exhibits 25, 26, 27 and 28).

103.105.    At Stefanos' request (and for the benefit of the Defendants) Kathleen provided further sensitivity analysis and commentary related to certain model assumptions (Exhibit 29, 30 and 31).

104.106.    Several times, Kathleen spoke directly with Randy Maultsby, Tiptree's Director of Corporate Strategy & Development, to clarify expectations on key terms of the LOI and passed that information back to Stefanos (Exhibit 32).

105.107.    Other times, she offered specific feedback and language to Stefanos for inclusion in his responses in order to ensure that he would not derail the transaction (Exhibit 33 and 34).

106.108.    To quantify concerns related to the LOI, Kathleen prepared an outline and prioritized the financial impact of each negotiable business term (Exhibit 35).

107.109.    Kathleen also participated in all subsequent in-person LOI negotiations following her initial introduction to the Tiptree team.

108.110.    At Stefanos' request on January 11, 2017, Kathleen began structuring a data room for interested investors.

109.111.    Concurrent with the LOI negotiations, efforts to market the deal to other potential investors continued.

19

110.112.    The purpose of continued marketing was twofold: 1) to potentially uncover an alternative lead investor, or absent that, 2) to maximize the number of minority investors so as to improve Swift Bulk's negotiating position with Tiptree.

111.113.    Meetings and/or introductions with potential investors during this period included: Ospraie, Ramius Capital, Twin Focus Capital, Watermill, Atlantic Street Capital, AUA Private Equity, CM-CIC Investissement, Huron Capital, Quad Group, and Cloverlay, amongst others (Exhibit 36).

112.114.    During this period, Kathleen structured and established the data room (Exhibits 37 and 38) and continued to revise / update the marketing material.

113.115.    From SwiftBulk's perspective, the objective of these negotiations had been to maximize founder's equity, maintain as much control as possible, and preserve the right to bring in minority investors (both from those already identified as well as new ones).

114.116.    Stefanos assured Kathleen that sourcing capital from minority investors was sacrosanct and specifically acknowledged this point when he stated that the "[m]ain outcome from yesterday's [negotiations with Tiptree] is ability to bring LP-type money into the enterprise . . . ." (Exhibit 41). Reflecting this priority, a specific clause was included in the final Tiptree LOI – "Additional Capital" (Exhibit 42).

115.117.    After several rounds of back-and-forth negotiations between Tiptree and SwiftBulk, the points of difference began to diminish, and agreements were reached on the remaining outstanding business terms.

116.118.    Up until the very moment of execution of the LOI, Stefanos relied on Kathleen as a trusted adviser and indispensable team member entrusted with critical roles and responsibilities for SwiftBulk and, ultimately, all of the Defendants.

117.119.    On March 22, 2017, Stefanos received an updated proposal from Tiptree, which he promptly forwarded to George and Kathleen stating that "I think we have a deal. Call me." (Exhibit 43).

118.120.    Stefanos asked for a final transaction review from Kathleen asking her to "[a]dvise me pls SK" (Exhibit 44) and, the next day, inquiring if the "confirm looks ok?" (Exhibit 106) and finally confirming with her that "[s]o I'm signing this one right?" (Exhibit 45).

119.121.    After conferring with Kathleen, on March 23, 2017 Stefanos signed Tiptree's LOI, which was address to "SwiftBulk Inc., c/o Silver Leaf Partners, 420 Lexington Avenue, Suite 2805, New York, New York, 10170" (Exhibit 42).

120.122.    Upon execution of the LOI, plans were made for a kick-off meeting.

121.123.    The initial agenda was sent to Kathleen and Stefanos by Randy Maultsby (Exhibit 46).

122.124.    Kathleen met Stefanos on April 2, 2017 to prepare for the meeting.

123.125.    On April 4, 2017, the kick-off meeting took place in the Tiptree Boardroom, followed by a smaller senior group dinner with Jonathan Ilany, Michael Barnes and Randy Maultsby which was also attended by George Graham, Kathleen, and Stefanos.

124.126.    Included in the discussion were strategies regarding the minority capital raise.

125.127.    At that time, both Michael Barnes and Jonathan Ilany appeared eager to work with Silver Leaf to identify additional investors.

126.128.    Following the kickoff, Siew Kwok of Tiptree sent out a working group list with Silver Leaf identified as Advisor to SwiftBulk (Exhibits 47, 48 and, 49).  Randy Maultsby scheduled a follow-up "Swiftbulk Financial Review" for April 12, 2017 in the Tiptree

Boardroom, whereby Silver Leaf was expected to walk through the financial model and projections.  Included in this meeting were Randy, Sandra Bell, along with junior Tiptree staff (Exhibit 85).

127.129.    In addition to capital raising, Kathleen continued in an advisory capacity, representing Stefanos' interests on a variety of matters, including the Nomikos investment, financial reviews with Tiptree, their designated due diligence consultant, and representing SwiftBulk's interest with Mintz Levin while Stefanos was out of town (Exhibit 50).

128.130.    On the capital raising front to source minority investors, Kathleen proceeded in the following months with the expectation that the Defendants were open to, and actively interested in solicitations from potential minority investors.

129.131.    The marketing presentation underwent revisions (Exhibit 51), names were added to the co-investor marketing list, and Kathleen hired DropBox to host an investor due diligence data room (Exhibits 39 and 40).

130.132.    Kathleen attended industry events and conferences, both within and outside of NYC, for the express purpose of promoting SwiftBulk to potential investors for the benefit of the Defendants.

131.133.    To ensure that her time was not expended in vain, Kathleen queried Stefanos and asked him: "Do you think TT will be willing to let minority investors co-invest in future rounds [as well]?" Stefanos replied: "Yes" (Exhibit 52).

132.134.    With Stefanos speaking on behalf of the Defendants, Kathleen introduced SwiftBulk to 38 private equity and/or family offices (Exhibit 36), and numerous additional high net worth individuals (including potential private investors affiliated with the aforementioned firms).

133.135.    Kathleen also introduced the SwiftBulk investment opportunity to numerous senior level accountants, attorneys, and other professionals to broaden the marketing reach.

134.136.    Degrees of interaction with these potential investors ranged from a few email exchanges, to presentations conducted by Kathleen alone, to pitches including Stefanos.

135.137.    As contemplated by the Engagement Letter, Kathleen continued to support Stefanos in meetings originating from all sources, including non-Silver Leaf introductions.

136.138.    Acknowledging Kathleen's efforts and Silver Leaf's fee expectancy, Stefanos told Kathleen that "I may put a few of my contacts in your bucket so you earn the % on that." (Exhibit 53).

137.139.    Disappointingly, Kathleen's effective marketing efforts were hampered by the distractions associated with Tiptree's continuing due diligence and Stefanos' growing unavailability.  During this time, potential investor meetings were deferred or postponed on several occasions such as with Cloverlay (Exhibit 54) and Stonepeak, for instance.

138.140.    Additionally, the evolving deal structure and lack of clarity related to AM Nomikos' role in the SwiftBulk undertaking proved a further marketing challenge and questions were never fully resolved regarding how subsequent investors would participate in the combined business structure (Exhibit 55).

139.141.    On June 14, 2017, Stefanos communicated to Kathleen that Tiptree was no longer interested in minority investors and required the cessation of further marketing efforts (Exhibit 56).

140.142.    With this communication, Silver Leaf lost its ability to get paid on any other capital raised outside of the commitments made by Tiptree and AM Nomikos.

141.143.    On April 7, 2017, Stefanos began communicating his next plan for Silver Leaf, when he shared with Kathleen to "try to retain broker dealer if you can / Can be great combo w SwiftBulk / one of the takeaways from my thing today" (Exhibit 57).

142.144.    Stefanos expected Kathleen and Silver Leaf to continue on as a part of the initial start-up team – "Sent him [Randy] a note about how I envision start up team after launch and you're on it as promised" (Exhibit 58).

143.145.    Stefanos specifically requested that Mintz Levin structure the transaction to take this into account (Exhibit 59) and enquired into Silver Leaf's brokerage capabilities (Exhibits 60 and 74).

144.146.    Indeed, the initial business plan Stefanos created and shared with Tiptree on June 2, 2017 (Exhibits 61 and 62) clearly included an "Asset Management Platform" intended to be executed via Silver Leaf.

145.147.    Key deliverables and work product from Kathleen during this phase of work included:

- Initial Analysis of LOI & Negotiating Points – Including Founder's Equity, Potential Capitalization Analysis, Comp Analysis, & Control Analysis (Exhibit 63);
- Draft response email negotiation with Tiptree (Exhibit 64);
- Outline of key business points to negotiate in LOI (Exhibit 65);
- Response to Tiptree's cash flow questions (Exhibit 66);
- Model forecast sensitivity analysis (Exhibits 67 and 30);
- Financial impact of hurdles and net cash flow to management (Exhibit 28);
- Outline and quantification / prioritization of each specific business term included in the LOI (Exhibit 35);
- Feedback re: initial proposal to AM Nomikos (Exhibits 68 and 69);
- AM Nomikos GP / LP structure (Exhibit 70);
- Detailed document of projected cash flows and returns to AM Nomikos under six different economic scenarios (Exhibits 71 and 72); and
- Participation in multiple post-LOI diligence meetings on the phone and in the Tiptree Boardroom (Exhibits 46 and 85).

146.148.    Both prior to and after the execution of the Tiptree LOI, the Defendants were courting and entering into negotiations to bring AM Nomikos into a joint venture relationship with SwiftBulk.

147.149.    Although the March 22, 2017 LOI signed by Stefanos and Jonathan Ilany referenced a $4,000,000 commitment from AM Nomikos, AM Nomikos not fully committed at that time.

148.150.    Before that, starting in January 27, 2017 Kathleen worked to bring AM Nomikos to the table as an investor when she, George Graham, Gary Christelis, and Stefanos, met with Markos Nomikos of AM Nomikos, in Boston, MA.

149.151.    The purpose of the trip was for the purpose of introducingto introduce Mr. Nomikos to the "Founder's Team", to speak to him about Tiptree, and to set the stage for broader access to Wall Street capital that would accrue to AM Nomikos as a result of a joint venture with SwiftBulk.

150.152.    Subsequent to this initial meeting, Kathleen assisted Stefanos in the ongoing negotiations with AM Nomikos by providing critical financial analyses, scenario modeling, and advising on proposals / communications with Mr. Nomikos, Yanni Stratakis, and Antonis Papantoniou (Exhibits 68 and 69).

151.153.    Kathleen modeled out the financial impact of the joint venture, and provided guidance on the various potential management and incentive splits with AM Nomikos (Exhibit 73).

152.154.    At AM Nomikos' request, she remodeled the entire transaction as a GP – LP structure (vs. the holding company structure that was proposed by Tiptree), in order to help AM Nomikos and the Defendants understand the economics of the transaction ((Exhibit 70).

25

153.155.      She also prepared a detailed document of projected cash flows and investment returns to AM Nomikos under six different economic scenarios (Exhibits 71 and 72).

154.156.      Ultimately, it was Kathleen and Silver Leaf that provided the work product that lay the foundation for a venture between the Defendants and AM Nomikos.

<u>Post-Fundraising Continued Transaction Support and Phila Coatings Advisory</u>
<u>(Mid June 2017 – Mid November 2017)</u>

155.157.      Following the forced wind-down of minority capital fundraising efforts, Kathleen played a smaller role in the next phase of work as the lawyers focused on the finer points of the legal structure and Stefanos focused on firming up the commitment from AM Nomikos and operational business matters.

156.158.      As always and as he had come to rely on, Kathleen continued to make herself available to Stefanos on short notice, day or night.

157.159.      As the SwiftBulk deal was coming together, Tiptree and Stefanos shifted focus to bring Phila Coatings, which was Stefano's family business, into the broader transaction structure that was now well underway.

158.160.      On July 21, 2017, Stefanos notified Kathleen of his discussions with Tiptree to fold Phila Coatings into an emerging conglomerate and requested Kathleen to explore options to obtain a line of credit to support Phila Coating's extended cash conversion cycle.

159.161.      Kathleen expressed her concern to Stefanos that he was not properly represented on the potential sale of his family business.

160.162.      When Kathleen asked him "Who's advising you [on a potential Phil Coatings acquisition]?", Stefanos replied "No one / Hopefully you will advise me a little bit" (Exhibit 75).

161.163.    Rightly, such work would fall under the scope of the Engagement Letter with Silver Leaf.

162.164.    The following day, Stefanos forwarded to Kathleen and George Graham an email from Randy Maultsby outlining Tiptree's thoughts on valuation related to Phila Coatings, and requested help to structure a counter proposal to Tiptree (Exhibit 76).

163.165.    To better position Phila Coatings for growth and a higher valuation, the immediate need was to sort out its working capital needs.

164.166.    To assist her efforts on behalf of all of the Defendants, Stefanos shared with Kathleen a July 19, 2017 accounts receivable aging schedule. In their entirety, the receivables schedule represented $763k in outstanding invoices.

165.167.    It became quickly evident, however, that the receivables in their present form were not suitable for traditional bank financing.

166.168.    In addition to being poorly tracked and presented, many of the receivables were more than 15 months past due and could not be used to support financing thereon.

167.169.    Kathleen offered to help Stefanos clean them up the balance sheet and urged him to reformat or write off bad debt and/or ramp up collection efforts on these receivables.

168.170.    Kathleen would make this same request time and time again (through March of 2018), but she never saw an updated receivables aging schedule or anything information that she would support her efforts with capital providers.

169.171.    The reason for this only became evident many months later in April 2018 when George Graham, one of the Founder's Team, told Kathleen he had lent against the receivables himself.

~~170.~~173. Although the receivables were not yet suitable for financing, Kathleen continued on in good faith to explore financing options.

~~171.~~173. In this process, Kathleen spoke to several banks, alternative lenders, and government-affiliated programs such as SBA and Ex-Im Bank because such government programs in particular seemed to be a good possible solution for some of the longer-dated receivables.

~~172.~~174. On numerous occasions, Kathleen forwarded program details to Stefanos and ~~urging~~ urged him to take action.

~~173.~~175. Concurrently, in August and September of 2017, Kathleen continued to work with Stefanos on other aspects of his Phila Coatings business plan, financial model, and other items related to a potential Tiptree acquisition of Phila Coatings (Exhibit 77).

~~174.~~176. Despite Kathleen's urging to stage the Phila Coatings transaction after a successful close of SwiftBulk transaction, Stefanos was intent on pushing this forward as expeditiously as possible.

177. On September 26, 2017, Stefanos asked Kathleen to meet him for a strategy session in advance of a Tiptree meeting the next day regarding Phila Coatings.

~~175.~~ Upon expiration of the initial one-year term as set forth in paragraph 2 of the Engagement Letter (Exhibit 2) the parties continued to perform as theretofore implying they mutually assented to a new contract under and containing the same provisions as the original Engagement Letter (Exhibit 2). *See Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352 (S.D.N.Y. 2016).

178.

**Formatted:** Font: (Default) Times New Roman, 12 pt

**Formatted:** Font: Italic

176.179.    On September 27, 2017, Kathleen and Stefanos met with Tiptree (primarily Tiptree Chief Financial Officer Sandra Bell, Randy Maultsby and their team) in the Tiptree Boardroom to discuss Tiptree's acquisition of Phila Coatings.

177.180.    The agenda of the meeting took Kathleen by surprise, as she had expected this to be an introductory session and business overview, much like what Stefanos and Kathleen had prepared for on the previous day.

178.181.    However, the meeting ended up being a deep-dive due diligence into Phila Coatings financials, including the receivables aging and financial forecasts, whereat Stefanos performed exceedingly poorly and was ill-prepared.

179.182.    In an effort to help Stefanos recover momentum for Phila Coatings, Kathleen prepared a list of detailed follow-up's with assigned responsibilities the very next day (Exhibit 78), which formed the basis of Stefano's email to Tiptree on October 27, 2017 (Exhibit 79).

180.183.    Included in Kathleen's agreed-on follow-ups was a thorough scrubbing of Stefano's Phila Coatings financial projections.

181.184.    In furtherance thereof, Kathleen created a second financial model that proved indispensable to the Defendants consideration of a Phil Coatings transaction.

182.185.    Stefanos forwarded this financial model to Sandra Bell of Tiptree, with other important Tiptree parties included thereon, on October 10, 2017, commenting to them that "Kathleen really helped me make my original model more usable and also added proforma valuation tabs." and instructing that for the purposes of follow up inquires, "Kathleen can help with anything model-related . . ." (Exhibit 80)

183.186.    As 2017 was drawing to a close and legal documents got closer to completion, the Defendants focus shifted to wrapping up the final task items related to the SwiftBulk acquisition.

184.187.    Not losing focus on Phila Coatings, Stefanos continued to reach out to Kathleen to help "make this [the Phila Coatings business plan] look more digestible somehow" (Exhibit 81) as he focused his own attention on finalizing the SwiftBulk transaction.

185.188.    Increasingly, Stefanos articulated his views regarding Kathleen's and Silver Leaf's appropriate compensation at deal closing.

186.189.    He also continued to rely on Kathleen, as he always had, during all critical stages of transaction closing such as backing into the structure for Tiptree's Reliance acquisition (Exhibit 82) and questions related to market practices associated with members tax distributions (Exhibit 83), amongst other matters.

187.190.    Key deliverables and work product from Kathleen during this phase of work included:

- Outline of items needed to begin discussions with Tiptree re: a Phila acquisition (Exhibit 77);
- Detailed list of follow-ups and responsibilities following Tiptree / Phila due diligence meeting (Exhibit 78);
- Phila Coatings Financial model (Exhibits 84 and 80); and
- Transaction Closing and Settlement Negotiations (Mid November 2017 – April 4, 2018).

188.191.    Ultimately, the transaction closed on January 17, 2018 and, as per the terms of the Engagement Letter: "All cash fees due SLP shall be paid to SLP immediately upon closing of any Fee transaction by wire transfer or immediately available funds from the gross proceeds." (Exhibit 2).

189.192.    No payment was made to Silver Leaf.  As the Defendants satisfied their own interests, they plotted to deny Kathleen and Silver Leaf of their interests.

190.193.    From mid-December through April 14, 2018, the Defendants engaged in one tactic after the next to deny Silver Leaf its transaction consideration as expressed in the Engagement Letter and as demanded in equity.

191.194.    Ultimately, on April 4, 2018, Neil Rifkind, Vice President, General Counsel and Secretary of Tiptree, speaking on behalf of all of the Defendants by electronic mail explicitly and officially breached the terms of the Engagement Letter by denying that Silver Leaf was owed transaction fees deriving from the Defendants transaction as contemplated by the Engagement Letter.

192.195.    Even in the face of this bad faith conduct by the Defendants,, Kathleen continued to act in in good faith in an advisory capacity with Stefanos and Tiptree (Exhibit 86) even continuing to be held out as SwiftBulk's banker in subsequent meetings with a potential acquisition target, Echoclor, Inc.

193.196.    In the face of Defendants, bad conduct Stefanos communicated his continued desire, whether genuine or disingenuine, for Kathleen to hold a board seat and for Silver Leaf to play an active role in future advisories stating to Kathleen that he "[j]ust spoke to Jonathan about you and silver leaf and your board seat." (Exhibit 87).

194.197.    Stefanos indicated that he "had another sit down with Jonathan, went well, also spoke of SLP context, and he'll talk to Michael . . . . let's see results!" (Exhibit 88).

195.198.    On Christmas Day, Stefanos texted to Kathleen "Merry Christmas to my dear friend and partner . . . . hope we have a great 2018 together." (Exhibit 88).

196.199.    In early January 2018, Kathleen proposed another meeting to follow up regarding Phila Coatings' exports and working capital needs with Stefanos agreeing to meet on January 5, 2018.  In a considerable departure from previous communications, Stefanos detailed an elaborate behind-the-scenes negotiation with Randy Maultsby whereby the Defendants were conspiring to breach the Engagement Letter and offer a paltry payment of $100,000 in cash and $100,000 in equivalent stock options to Silver Leaf and Kathleen.

197.200.    Stefanos explained that this was merely the opening point for negotiations and was confident that the final agreement would be at least double this meager proposal, but and include a signed engagement letter contemplating future work between Silver Leaf and the Defendants.

198.201.    Kathleen expressed concern regarding Stefanos' hypothetical proposal and requested that he send whatever was proposed in writing, while stating to him that she "didn't want to become a collections officer".

199.202.    Two days later, Stefanos messaged Kathleen the outlines of his negotiating strategy indicating that "[p]lan is to bring it up to Jonathan Tuesday afternoon so we can offer you improved proposal Wednesday and transfer cash by end of the week / In addition to the other elements (cash will be from deal expenses" (Exhibit 89).

200.203.    He also sent Kathleen two emails on January 7, 2018. The first email (Exhibit 90) outlined the proposal Stefanos had described on January 5th indicating that he had discussed this proposal with Randy and that it was intended to reflect "the very good advice and support you have provided to me personally and that I hope you will continue to provide going forward". Stefanos further stated that "[o]bviously this deal has not turned out as originally envisaged, given GG's introduction to Tiptree and subsequently postponing the raising of the

32

20m minority capital. So in the spirit of transparency and the excellent collaboration we have

enjoyed, I would welcome your thoughts." Continuing with the empty platitudes, he further said

"[p]lease do note Tiptree does recognize your contribution, and it is all of your stated intention to

engage you / Silver Leaf again as we grow the business (especially considering the groundwork

you have already put in place".

201.204.     In a second email that very same day (Exhibit 91), Stefanos sent four

documents related to the LLC Agreement, and the Equity Incentive plan units and in the body of

the email, Stefanos stated that he was working on the following counterproposal - "This is what I

[Stefanos] am working for:

1) 200k cash;

2) 200k base of the B-1 time-based units (so no performance hurdle);

3) Formal engagement between SwiftBulk (ie. the UK Holdco) and SLP . . . . maybe for
up to a 10mm raise, valid through the end of 2019?"

202.205.     Stefanos then suggested that the next step was that "we draft response to

my email from my SB account so I can forward to Jonathan." He concludes with "We'll get this

done!"

203.206.     On January 10, 2018, as a part of Stefanos' ongoing negotiating duplicity,

he emailed Kathleen a proposed draft "response" (Exhibit 92) to his first January 7 email

(Exhibit 90).

204.207.     In this email, Stefanos drafted a very specific response which he suggested

that Kathleen send to Tiptree in response to the Defendants' January 5th proposal.

205.208.     The email drafted by Stefanos outlined several potential future deals

Kathleen and Stefanos had previously discussed (*e.g.*, Jones Act opportunities, Swap

Settlements, and Florida paint company for instance), and also summarized much of the work

that Kathleen and Silver Leaf had completed over the course of the engagement culminating in

Stefanos' views about what normal broker-dealer fees are for the services provided by Silver

Leaf and Kathleen to the Defendants as follows:

> "The fact is that for a lower-middle market deal the average investment banking broker-dealer fee is comfortably in the 3-4% range. This is for support throughout the deal: financial modeling, capital introductions, deal negotiation, etc. Frequently there is a retainer as well.

> Given Swiftbulk startup nature we had agreed to a 5%+ fee on Silver Leaf introductions without a retainer. Obviously we took a lot of risk in good faith upfront and put the work in and make Swiftbulk possible. I have taken a look at my emails and the data room we prepared. Starting in August 2016, we have gone through many iterations of financial models, investor decks, teasers, family office databases, PPMs, I have traveled to investor conferences and joined you on the trip to Boston to meet Markos, participating in all the law firm meetings when you were choosing counsel, arranged investor meetings, helped with the two LOI negotiations we had going on and then of course continued to support the process after you ended up going with Tiptree. "

> Stefanos continued ". . . [George's] introduction would have been moot if it was not for all the work I [Kathleen] executed and oversaw along with you. We are talking about at least 6 months during which Swiftbulk was my [Kathleen's] primary focus. Don't forget I also put Silver Leaf's name on this deal and we frequently made use of their offices."

> > 206.209.        Kathleen refused to send Stefanos' pre-drafted email, and stated to him

that she was not in the position to send such a letter without the support of Silver Leaf's

executive management, and that she took particular took issue with the final paragraph where

Stefanos suggested that Kathleen state that "[she is] obviously not expecting that amount given

how things turned out . . ."

> 207.210.       An agreement was made to have a follow-up face-to-face discussion with

Silver Leaf's managing principal, Fyzul Khan, on January 16, 2018.

> 208.211.       Stefanos followed up with a text documenting the call, stating that he

"[v]ery much appreciate the call and all your supportive tone the last week. Know that I am

really sad about many parts of the broader situation . . . . I feel like I will be signing those papers

with disgust. I promise you I will do 150% of what is in my power for you personally . . . the rest is outside my control" (Exhibit 93).

~~209.~~212.      On January 16, 2017, Stefanos met with Kathleen and Fyzul at the Silver Leaf's offices.

~~210.~~213.      At that meeting a preliminary agreement was reached whereby compensation would once again consist of three elements:

- $400,000 cash payment plan;
- $200,000 Management Incentive Units; and
- a new engagement letter confirming Silver Leaf's participation in the next three transactions, to include a minimum advisory payment of $150k per transaction.

~~211.~~214.      Although it was agreed that the cash payment (and indeed all aspects of the proposal) was intended to compensate work already completed (*i.e.* not future work), it would be structured as a consulting agreement to make the proposal more palatable to all of the Defendants.

~~212.~~215.      The consulting agreement committed Silver Leaf to a *de minimis* amount of ongoing consulting (5 hours / week), with an hourly rate for any additional consulting.

~~213.~~216.      During this time, on January 17, 2018, Tiptree, SwiftBulk, and Am Nomikos consummated a transaction and closed their deal, and again refused to pay Silver Leaf the transaction fees contemplated by the Engagement Letter.

~~214.~~217.      Kathleen had a follow-up discussion with Stefanos on January 18, 2018 to recap the terms discussed earlier in the week with Fyzul.

~~215.~~218.      Stefanos suggested that Fyzul draft the documents associated with this agreement as a next step.

35

216.219.    Kathleen warned Stefanos that she hoped he was sincere in his commitment, because Fyzul would be even more angry if he put all of these agreements together and the Defendants proved unwilling to bridge this gap vis-à-vis their most recent proposal to Silver Leaf.

217.220.    He replied, "I understand you crystal clear." (Exhibit 94).

218.221.    He further stated, "I'm no longer a startup entrepreneur – we will have a formal business with a structure and ability to enter agreements . . . I know I'll be fine longer term so I'm not trying to scrape 100k here or there." (Exhibit 95).

219.222.    On January 22, 2018 Kathleen sent Stefanos a draft consulting agreement (Exhibit 96) and engagement letter (Exhibit 97) prepared by Silver Leaf that reflected the terms discussed on January 16th.

220.223.    Following this, the next three months consisted of a cat-and-mouse game where Kathleen would chase Stefanos for an executed agreement, and Stefanos would respond both verbally and in writing with a combination of encouraging words, promising feedback from Michael, Jonathan, Sandra, and Randy, and further promises to follow up "tomorrow" (Exhibits 98, 99, 100, 101, 102, 103, 104, 105, 106 and 107).

221.224.    On February 9, 2018, Stefanos claimed to have reviewed the agreements and received "Positive reaction by Randy and Sandra . . . Also spoke about the units and how to package them. So all positive and good" (Exhibit 108).

222.225.    Meanwhile, future plans involving Silver Leaf continued. On February 14, 2018, Kathleen reached out to Stefanos once again, and he explained that he has been very busy so "please give me until the end of the week to touch base" (Exhibit 109).

223.226.     When Kathleen suggested that an executed engagement letter would allow her to assist in consulting with various projects, thereby freeing up some of his time, Stefanos responded "You are 150% right and I also need your help creating a more dynamic model on the shipping side." He attached the SwiftBulk investment thesis and outlines what "we" will need to prepare on an ongoing basis (Exhibit 110).

224.227.     After more back-and-forth communications in which Stefanos continued to discuss future collaborations with Silver Leaf, and offered excuses (*e.g.*, new build decisions, 10-K preparation and so on) regarding Tiptree's delayed response to the proposed agreements Stefanos, on March 2, 2018, finally called Kathleen to communicate the Defendants' intentions regarding the proposed agreements.

225.228.     Stefanos communicated that, based on discussions with Randy and Jonathan, the Defendants would agree to the $400k cash component, and $200k in equity, but not the Silver Leaf transaction-related engagement letter.

226.229.     Stefanos explained that Tiptree was not willing to sign an "open ended" engagement letter, but that they had every intention to engage Silver Leaf in their next transaction.

227.230.     Immediately after the phone call, Kathleen outlined the discussion Tiptree's counterproposal via email and Stefanos confirmed as follows (Exhibit 111):

> "Kathleen,
>
> Acknowledged and confirmed from my side. Tiptree will be responding to Fyzul as well.
>
> Just want to be clear that you are first in line for future raised as my advisor and insider - point 3 [the transaction related engagement letter] is to say the terms of said engagement to be discussed at the time of the raise.
>
> Many thanks
>
> Stefanos"

228.231.      Although this new position was a departure from the terms discussed in the January 16th meeting, Silver Leaf was open to postponing the execution of a new engagement letter based on the assurances that were being given by Stefanos indicating that Silver Leaf would be included in the next transaction.

229.232.      Stefanos then sent Kathleen an email regarding the potential Tiptree Marine acquisition of Ecochlor. He suggested that Kathleen join the meeting and the working lunch, as part of the expectancy for an ongoing engagement with Silver Leaf (Exhibit 112).

230.233.      He proceeded to send several more emails with multiple files regarding investment information, and requested that Kathleen and Stefanos meet in advance to "discuss qualitative synergies, etc." (Exhibit 113).

231.234.      Stefanos promised "If you help me like I know you can, then if SWBK goes public, you will be the first person I ask for CFO / and I believe we can do that." (Exhibit 114).

232.235.      In what would end up being Kathleen's and Silver Leaf's final advisory role with SwiftBulk, she began reviewing information provided on Ecochlor, and prepared feedback & diligence questions which she then shared with Stefanos in advance of their meeting.

233.236.      Although the promised agreements between Silver Leaf and the Defendants, as promised by Stefanos, were not yet formally executed, Kathleen took comfort in Stefanos' verbal commitment and confirmation email on March 2nd at which point it was her understanding from Stefanos that a deal had been reached, and the only hold-up was a final legal review from Tiptree's counsel.

234.237.　　　On March 8, 2018, Kathleen participated in an initial diligence meeting with SwiftBulk and Ecochlor, including pre- & post diligence preparation with Stefanos at his new office in Tiptree's headquarters.

235.238.　　　During the meeting, Kathleen was introduced as SwiftBulk's banker, and Stefanos encouraged Ecochlor to include Kathleen in all subsequent communications.

236.239.　　　Stefanos clearly communicated to Ecochlor that Kathleen would be leading the diligence and deal structuring effort in his absence (as he was planning on traveling in the coming weeks).

237.240.　　　Following the meeting, Stefanos forwarded additional Ecochlor information for review on March 18, 2018.  He also communicated encouraging words regarding the finalization of the Defendants' agreement with Silver Leaf, stating, "Neil markup very little change / negligible changes. So should be good to go for everybody." (Exhibit 115).

238.241.　　　Kathleen spent some time further analyzing the Ecochlor material, before ultimately abandoning the work as Silver Leaf's relations with the Defendants fully deteriorated in the coming weeks.

239.242.　　　On March 19, 2018, Neil Rifkind sent a Tiptree Marine-Silver Leaf consulting agreement, requesting that Silver Leaf provide "any questions or comments or if this can be finalized" (Exhibits 116 and 117).

240.243.　　　The proposed agreement largely reflected the business terms as acknowledged via email by Stefanos on March 2nd but did not include the $100,000 initial payment discussed by the parties.

241.244.　　　Kathleen immediately called Stefanos to enquire regarding this omission.

242.245.    Over the phone, Stefanos assured Kathleen that this was an unintentional omission which he ascribed to an oversight on the Defendants part when combining the original two documents into one.

243.246.    Stefanos assured Kathleen that the business agreement was exactly as described and documented via email on March 2nd, and suggested that Silver Leaf "redline" the agreement with that change.

244.247.    Per Stefanos' suggestion, on March 20, 2018 Kathleen sent a redlined agreement back with the required change.

245.248.    On March 26, 2018, Stefanos notified Kathleen that Tiptree was no longer willing to sign off on the previous terms and indicated that the Defendants were now only willing to offer a $300,000 payment for Silver Leaf to walk away from any claims.

246.249.    According to Stefanos, the Defendants had now determined that stock warrants should be reserved for future employees and no warrants would now be granted to Silver Leaf or anyone else.

247.250.    Additionally, and suddenly, no claimed assurances of future business between Silver Leaf and the Defendants were mentioned and, in fact, Stefanos' communication hinted that Defendants would now withdraw this possibility too.

248.251.    Stefanos indicated that Sandra Bell was the individual who instructed SwiftBulk to breach the Engagement Letter despite, on at least two prior occasions (Exhibits 99 and 103) going back to February 9, 2018, Stefanos indicated that the Tiptree Defendants were aware of and accepting of the agreement.

249.252.    The third and final attempted re-negotiation was a closing farce that was not acceptable to Silver Leaf, and represented a payment so far below what was then now owing

under and pursuant to the terms of the Engagement Letter and market rates for the services provided.

250.253.        On March 27, 2018, Fyzul re-sent the red-lined agreement and stated that Silver Leaf was not willing to accept anything less than the previously agreed terms.

251.254.        One final call between Silver Leaf (Fyzul and Kathleen) and the Defendants' representatives (Neil and Stefanos) took place on April 3, 2018 without resolution.

252.255.        During that call, Neil warned Silver Leaf that the Defendants were highly litigious and would not hesitate to counter-sue should Silver Leaf make attempts to collect fees owed and this threat was echoed by Stefanos to Kathleen several more times.

253.256.        On April 4, 2018, Defendants sent an email to Silver Leaf formally refuting any claims to compensation held by Silver Leaf (Exhibit 118).

254.257.        Several times thereafter, on behalf of the Defendants, Stefanos communicated with Kathleen and stated to her that "between us I think Fyzul came off as unsophisticated and the fact that he has not engaged outside counsel is not a good sign for your interests . . . " (Exhibit 119).

255.258.        Lathered in ominous tones, Stefanos raised the threat of counter-litigation stating that "…Fyzul will need to take this to litigation, be possibly susceptible to frivolous action countersuit, in addition to not collecting." (Exhibit 120), and don't let him [Fyzul] fuck it up [for you]. (Exhibit 121).

256.259.        Kathleen received one final communication from Stefanos on June 15, 2018 where he offered to "propose something new to Jonathan . . . thinking 200k cash, 200k SwiftBulk Equity." (Exhibit 122).

257.260.    Kathleen responded stating that she was unable to discuss a settlement via text but remained available to discuss in person or on the phone if there was a real pathway to an amicable resolution.

258.261.    Kathleen never heard from Stefanos again.

259.262.    All Defendants knew of Silver Leaf's and Kathleen's involvement in and work on the transaction between and involving Tiptree Inc. and Phila Coatings Chemicals, USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd.,, *inter alia.*

260.263.    All Defendants knew or should have known that Silver Leaf had an Engagement Letter that included and/or covered a transaction by and among each and every one the entity Defendants..

261.264.    All Defendants knew or should have known that Silver Leaf was providing transaction services for a fee and not as an act of charity.

262.265.    All Defendants willfully, intentionally, recklessly, and fraudulently ignored, denied and denounced (*see* Exhibit 3) Silver Leaf's right to payment under the terms of the Engagement Letter despite (i) personal knowledge of the same, (ii) personal knowledge of Silver Leaf's and Kathleen's work on all matters herein described, (iii) being in transaction meetings and phone calls personally with Kathleen, (iv) personal assurances of compensation, and (v) despite attempts to negotiate paltry payments in satisfaction of their contractual obligations to Silver Leaf.

266.    In summary, Defendants' conduct are equal parts outrageous, illegal, morally reprehensible, offensive to notions of common decency, the product of bad faith, an example of

unfair dealing, bordering on the criminal, and warranting an award of punitive damages against

each and every one of them on a joint and several basis.

1.267.  New York courts have also formally recognized tortious interference with

contractual relations as an independent tort. *See, e.g., Anesthesia Assoc. of Mount Kisco, LLP v.*

*N. Westchester Hosp. Ctr.*, 873 N.Y.S. 2d 679, 682, 59 A.D.3d 473 (2009). As with other torts,

punitive damages may be awarded. *See, e.g., Don Buchwald & Assoc., Inc. v. Rich*, 723 N.Y.S.

2d 8, 9, 281 A.D.2d 329 (2001) (noting that punitive damages may be awarded for tortious

interference with economic relations upon a showing of intentional or deliberate wrongdoing,

aggravating or outrageous circumstances, a fraudulent or evil motive, or a willful and wanton

disregard of the rights of others).

**COUNT I**

**TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP**

2.268.  Silver Leaf re-alleges and incorporates each of the foregoing paragraphs by

reference as if fully set forth herein.

3.269.  "The American Law Institute in the Restatement of the Law of Torts 2d, adopted

May, 1977, has stated the fundamental principle: "One who intentionally and

improperly interferes with the performance of a contract (except a contract to marry)

between another and a third person by inducing or otherwise causing the third person

not to perform the contract, is subject to liability to the other for the pecuniary loss

resulting to the other from the failure of the third person to perform the contract." (§

766.)

*Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 189

(N.Y. 1980)

43

4.270.  "Under New York law, to establish a prima facie case of tortious interference with contract, a plaintiff must plead four elements: (I) a valid contract between plaintiff and a third party, (2) defendant's knowledge of the contract, (3) defendant's "intentional inducement" of the third party to breach the contract, and (4) damages. See Kronos, Inc. v. AVX Corp.,612 N.E.2d 289, 292 (N.Y. 1993).

*Wolff v. Rare Medium, Inc.*, 01 Civ. 4279 (VM), at *1 (S.D.N.Y. Nov. 13, 2001)

5.271.  "Phrased another way, the third element involves a defendant's 'improper intentional interference with performance' of an existing contract. Imtrac Industries, Inc. v. Glassexport Co., No. 90 Civ. 6058, 1996 WL 39294, *7 (S.D.N.Y. Feb. 1, 1996) (quoting Enercomp, Inc. v. McCorhill Publishing, Inc.,873 F.2d 536, 541 (2d Cir. 1989)).

*Wolff v. Rare Medium, Inc.*, 01 Civ. 4279 (VM), at *1 (S.D.N.Y. Nov. 13, 2001)

6.272.  Silver Leaf has a valid contract in the form of the Engagement Letter with Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*, all of which were at all relevant times herein affiliates of each other and/or consolidated and/or controlled entities of Tiptree Inc., that grant Silver Leaf fees and payments when Phila Coatings Chemicals, USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd.,, *inter alia*, received capital investment, financing or were acquired which in fact happened as described *supra*.

7.273.  As described *supra*, all Defendants, jointly and severally, knew or should have known of Silver Leaf's Engagement Letter with Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at:  0.75"

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at:  0.75"

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at:  0.75"

Co. Ltd., *inter alia*, given their extensive interaction with Silver Leaf's agent and registered representative, Kathleen Lauster, and their direct communications in person and via email with Kathleen Lauster and Stefanos Kasselakis' clear introduction of Kathleen Lauster to the Defendants, jointly and severally, as the investment banker for Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*.

8.274.  Defendants, jointly and severally, intentionally induced Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*,  to breach their contract(s) with Silver Leaf and/or to refuse to enter future contracts with Silver Leaf.

9.275.  Defendants, jointly and severally, had and have no lawful justification for their tortious interference with Silver Leaf's contract(s) and prospective economic advantage with Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*.

10.276.      Defendants, jointly and severally, used "physical violence, fraud, or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure" *Wolff v. Rare Medium, Inc.*, 01 Civ. 4279 (VM), at *1 (S.D.N.Y. Nov. 13, 2001), and other wrongful means some of which are presently unbeknownst to Plaintiff to intentionally induce Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*., to breach their contract(s) with Silver Leaf.

11.277.      At the time of said intentional inducement of breach by the Defendants, jointly and severally, Phila Coatings Chemicals USA, Inc., and/or "New Entities"

SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*, were affiliates of each other and/or consolidated and/or controlled entities of Tiptree Inc., thus subjecting them to undue influence, economic pressure and threat and employment pressure or other illegal and wrongful threat if they did not breach their contract(s) with Silver Leaf.

12.278.    Silver Leaf has suffered and will continue to suffer damages due to the Defendants' joint and several tortious interference with its contract(s) and/or prospective economic advantage.

### COUNT II:
### UNJUST ENRICHMENT

13.279.    Silver Leaf re-alleges and incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

14.280.    "The majority now requires plaintiffs pleading unjust enrichment to have a "sufficient relationship" with defendant, involving "dealings with each other" ( *see* majority op. at 513, 518, 950 N.Y.S.2d at 334, 337, 973 N.E.2d at 744, 747)" *Ga. Malone & Co. v. Rieder*, 19 N.Y.3d 511, 520-21 (N.Y. 2012).

15.281.    Silver Leaf by and through its agent and registered representative, Kathleen Lauster, has demonstrated *supra* a substantial advisory and working relationship with the Defendants jointly and severally for approximately 19 months consisting of dozens of meetings, hundreds of phone calls and text messages and emails and hundreds of hours of preparation and analysis leading to a successful business transaction by Tiptree Inc. with Silver Leaf's client(s) culminating in over $70 million of capital investment in a successful maritime shipping business.

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at:  0.75"

16.282.     Defendants jointly and severally had full knowledge of Silver Leaf's Agreement with Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*, all of which were at all relevant times herein affiliates and/or consolidated and/or controlled entities of Tiptree Inc.

17.283.     At all times relevant to this litigation, Defendants jointly and severally owed a legal duty to Silver Leaf to not unfairly or unduly take advantage of Silver Leaf or its agent and registered representative, Kathleen Lauster, or commit wrongful acts in order to unjustly enrich themselves at Silver Leaf's expense or at the expense of Silver Leaf's financial interests.

18.284.     During the period from approximately July 21, 2016 to April 4, 2018, Defendants jointly and severally unjustly enriched themselves by wrongfully converting, taking, or utilizing the intellectual property, efforts, advice and financial interests of Silver Leaf and its agent and registered representative, Kathleen Lauster.

19.285.     Such acts and omissions leading to the Defendants' joint and several unjust enrichment were the actual and proximate cause of harm to Silver Leaf.

20.286.     Silver Leaf has suffered and will continue to suffer irreparable harm due to Defendants' joint and several unjust enrichment.

**COUNT III:**

**FRAUD**

21.287.     Silver Leaf re-alleges and incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

22.288.    The elements of a fraud cause of action consist of " 'a misrepresentation

or a material omission of fact which was false and known to be false by [the]

defendant, made for the purpose of inducing the other party to rely upon it, justifiable

reliance of the other party on the misrepresentation or material omission, and injury' "

(*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 919 N.Y.S.2d 465, 944

N.E.2d 1104 [2011], quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413,

421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 [1996] ; *see Eurycleia Partners, LP v.*

*Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d

976 [2009] )

*Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (N.Y. 2016)

23.289.    "…New York requires proof of the traditional five elements of fraud:

misrepresentation of a material fact, falsity of that representation, *scienter,* reliance

and damages, see, e. g., *Jo Ann Homes v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d

799, 803 (1969); 24 N.Y.Jur., Fraud Deceit § 14 at 47-48 (1962)…."

*Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980)

24.290.    As described *supra* Defendant Stefanos Kasselakis and other Defendants

jointly and severally misrepresented on numerous occasions that Silver Leaf would be

paid or otherwise compensated for the work it had done and was doing by and

through its agent and registered representative Kathleen Lauster for transactions

involving Phila Coatings Chemicals USA, Inc., and/or "New Entities" SwiftBulk Inc.;

Tiptree Marine LLC and, Swift Bulk Holding Co. Ltd., *inter alia*, all of which were at

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

all relevant times herein affiliates and/or consolidated and/or controlled entities of
Tiptree Inc.

25.291.    Defendant Stefanos Kasselakis and other Defendants jointly and severally
knew the representation(s) *supra* made to Silver Leaf about compensation and
payment were false.

26.292.    Said false representations described *supra* by Defendant Stefanos
Kasselakis and other Defendants jointly and severally were made for the purpose of
inducing Silver Leaf, by and through its agent and registered representative, Kathleen
Lauster, to rely upon said false statements so Silver Leaf and Kathleen Lauster would
continue to work in support of transactions involving Phila Coatings Chemicals USA,
Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift Bulk
Holding Co. Ltd., *inter alia*, all of which were at all relevant times herein affiliates
and/or consolidated and/or controlled entities of Tiptree Inc.

27.293.    Silver Leaf justifiably relied upon the false representations of Defendant
Stefanos Kasselakis and other Defendants jointly and severally as it continued to do
substantial work in furtherance of transactions involving Phila Coatings Chemicals
USA, Inc., and/or "New Entities" SwiftBulk Inc.; Tiptree Marine LLC and, Swift
Bulk Holding Co. Ltd., *inter alia*, all of which were at all relevant times herein
affiliates and/or consolidated and/or controlled entities of Tiptree Inc.

28.294.    Silver Leaf has suffered and will continue to suffer irreparable harm due to
Defendants' joint and several false representations.

WHEREFORE, Plaintiff, Silver Leaf Partners, LLC., requests a TRIAL BY JURY and demands, in total on all counts, that judgment be entered in its favor against Defendants, jointly and severally as follows:

- $5,026,000.00 for the fees to which Silver Leaf is entitled pursuant to the Engagement Letter and Tiptree's publicly announced investments in "maritime transportation" as described *supra*; and,

- Interest thereon to date in the amount of $646,379.25 [RECALCULATE] accruing at the New York statutory rate of 9% per annum and to be amended and proven further at a future trial date; and,

- Punitive and exemplary treble damages in the amount of $17,023,137.75071,137.75 ($5,64772,379.25 x 3) [RECALCULATE]; and,

- Costs of this action; and,

- Attorney's fees; and,

- For such further equitable or other relief the Court finds proper and necessary.

IS IT NECESSARY TO INSERT A STATEMENT ABOUT A BENCH OR JURY TRIAL?

LET'S DISCUSS THE CONTRACTUAL BREACH AGAIN!

Respectfully submitted,

s/ M. Fyzul Khan
M. Fyzul Khan, Attorney
200 Park Avenue, Floor 17
New York, New York  10166
(212) 632-8421
fyzulk1@gmail.com

and

**s/ Jeffrey A. Sexton**
Jeffrey A. Sexton, Attorney
*pro hac vice* motion to be filed
Pirata PSC
325 W. Main St., Suite 150
Louisville, KY 40202
212-~~545~~18~~5-9000~~4444
800-524-3139 fax
jsexton@jeffsexton.com

51